*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DARETHA BRAZIEL, Individually and as Next
Friend of DB, a Minor, and DR, a Minor, KEESHA
JONES, Individually and as Next Friend of DJ, a
Minor, TMC, a Minor, TC, a Minor, and KLB, a
Minor, IEASHA JONES, Individually and as Next
Friend of DJ, a Minor, KK, a Minor, KF, a Minor,
SJ, a Minor, and DAJ, a Minor, EMMA KINNARD,
STACEY BRANSCUMB, and MICHAEL D.
BRIGHAM,

        Plaintiffs-Appellees,

UNPUBLISHED
June 10, 2025
3:06 PM

v

CITY OF BENTON HARBOR WATER
DEPARTMENT, ELHORN ENGINEERING, F&V
OPERATIONS INC., and CITY OF BENTON
HARBOR,

No. 370316
Berrien Circuit Court
LC No. 23-000249-NM

        Defendants,

and

MICHAEL O'MALLEY, Individually and In His
Official Capacity,

        Defendant-Appellant.

Before: BOONSTRA, P.J., and LETICA and REDFORD, JJ.

PER CURIAM.

-1-

Defendant, Michael O'Malley,[1] appeals as of right a March 11, 2024 order denying his motion for summary disposition under MCR 2.116(C)(7) (governmental immunity) and (C)(8) (failure to state a claim). On appeal, defendant argues the trial court erred by denying his motion for summary disposition and declining to dismiss him from the action because he was entitled to governmental immunity under the Governmental Tort Liability Act ("GTLA"), MCL 691.1401 *et seq.*, on the basis of either absolute or qualified immunity. Because we find no error in the trial court's decision, we affirm and remand to the trial court for further proceedings.

## I. FACTUAL BACKGROUND[2]

This case concerns defendant's response to the discovery of lead in the City of Benton Harbor's ("the City") municipal water system in excess of lead action levels. Lead is a neurotoxin that is particularly dangerous to children. Both federal and Michigan law regulate the quality of drinking water for the public under their respective Safe Drinking Water Acts ("SDWA"). 42 USC 300f *et seq.*; MCL 325.1001 *et seq.* In Michigan, the Department of Environment, Great Lakes, and Energy ("EGLE"), formerly known as the Department of Environmental Quality, is the department with "power and control over public water supplies and suppliers of water." MCL 325.1002(g); MCL 325.1003.

EGLE sets standards for the monitoring, treatment, and prevention of lead contamination in drinking water in the Lead and Copper Rule, Mich Admin Code, R 325.10101 *et seq.*[3] These standards require governing authorities to take particular actions when the public water supply's lead level exceeds "0.015 milligrams per liter (mg/l) in tap water samples collected during a monitoring period . . . ." Mich Admin Code, R 325.10604f(c). These actions include issuing public advisories and public education materials to the persons served by the water supply and offering to arrange for water sampling to customers who request it. Mich Admin Code, R 325.10410(1). Additionally, governing authorities who were previously in compliance with lead action levels must increase testing frequency from every three years, Mich Admin Code, R 325.10710a(4)(d)(*iii*), to every six months, Mich Admin Code, R 325.10710c(2), and correct corrosion problems through corrosion-control studies and treatment, Mich Admin Code, R 325.10604f(1)(b).

The typical source of lead contamination is not the source water, but lead leaching from older pipes in the water delivery system. Such is the case in Benton Harbor. The City sources its water from Lake Michigan, which does not contain lead. However, the City's public water system

---

[1] Although O'Malley is one of several defendants in this action, we refer to O'Malley as "defendant" because he is the only defendant who appealed the trial court's March 11, 2024 order. We still use "defendants" to refer collectively to all of the defendants named in this case.

[2] The facts stated in this case are taken from plaintiffs' complaint. For purposes of this appeal, we accept the pleadings as true.

[3] The Environmental Protection Agency also requires specific standards for the monitoring, treatment, and prevention of lead contamination in drinking water in the National Primary Drinking Water Regulations. 40 CFR 141 *et seq.*

is 100 years old. In 2018, lead exceeding the lead action level at 22 parts per billion (ppb) and the bacteria E. coli were both identified in Benton Harbor's municipal water system.

Plaintiffs have alleged that defendants treated the lead contamination with a corrosion-control treatment called "Carus 8600," which was a generic phosphate blend and that they did so without a corrosion-control study, without tailoring the phosphate blend to the water system's particular needs, and without monitoring its effectiveness. While using this blend to treat corrosion, plaintiffs assert the level of lead in the water supply increased. As recent as the testing period from January to June 2021, testing performed in some Benton Harbor homes measured lead up to 889 ppb.

Although the level of lead in the water supply continued to increase, defendants represented to plaintiffs that they were successfully remedying the lead contamination. Defendants also represented that water filters, which were untested or ineffective for treatment of water with a lead concentration over 150 ppb, would mitigate contamination. This caused plaintiffs to unknowingly consume lead-contaminated water. Plaintiffs were not told to stop consuming the water until late 2021.

In October 2023, plaintiffs filed a putative class action against O'Malley, who was the Director of the Benton Harbor Water Department, the City, and two private corporations, who had contracted with the City to address the lead contamination, for mismanaging the response to the discovery of the elevated lead levels and intentionally misleading the public about remediation of the water contamination. Plaintiffs alleged a claim of gross negligence against O'Malley. In support of this claim, plaintiffs alleged that "O'Malley's inaction or ineffective action failed to stop the exceedingly high lead action level exceedances." Plaintiffs also alleged:

> From 2018-2020, although [sic] Benton Harbor's water supply was contaminated with lead, bacteria and other contaminants and each testing and monitoring sample period revealed lead levels violated federal and State Safe Drinking Water Acts and the Lead and Copper rule. Although the water supply was unsafe to ingest, Defendant O'Malley repeatedly denied, lied and covered up this public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink.

O'Malley moved for summary disposition under MCR 2.116(C)(7) and (C)(8) on the basis that he had governmental immunity against plaintiffs' claim. First, relying on a few provisions in the Benton Harbor Charter, O'Malley argued he was entitled to absolute immunity because he was the "highest appointive official" of a "level of government" as the Director of the Benton Harbor Water Department. Second, O'Malley argued he was entitled to qualified immunity because plaintiffs failed to allege that O'Malley's conduct amounted to gross negligence or that he was the proximate cause of plaintiffs' injuries. Accordingly, O'Malley asserted he was entitled to summary disposition on plaintiffs' claims and dismissal from the action.

Plaintiffs responded to O'Malley's motion for summary disposition, arguing, first, that O'Malley was not entitled to absolute immunity because the Water Department was not a "level of government." Plaintiffs argued the provisions in the Benton Harbor Charter showed only that the Water Department had "supervision" over the water supply, which did not demonstrate

autonomous authority.  Second, that the allegations in their complaint, accepted as true, stated an actionable claim of gross negligence against O'Malley because they alleged that O'Malley intentionally lied about the water quality, failed to file accurate reports, and falsified documents, all while telling residents that the water was safe to drink.

The trial court denied O'Malley's motion for summary disposition in relation to both his absolute immunity and qualified immunity arguments.  The trial court explained that defendant only presented a few pages of the Benton Harbor Charter to the trial court in support of his absolute immunity argument.  The trial court noted that review of the remainder of the Charter and other evidence was necessary to determine whether O'Malley was entitled as a matter of law to absolute immunity.  The trial court further explained that although plaintiffs' complaint contains some conclusory allegations, the pleadings still sufficiently alleged O'Malley's conduct was grossly negligent.

This appeal followed.

## II.  STANDARD OF REVIEW

The applicability of governmental immunity is a question this Court reviews de novo. *Beals v Michigan*, 497 Mich 363, 369; 871 NW2d 5 (2015), overruled in part on other grounds by *Ray v Swager*, 501 Mich 52, 72 n 49; 903 NW2d 366 (2017).  This Court also reviews de novo a decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

A trial court may grant summary disposition under MCR 2.116(C)(7) on the basis of governmental immunity. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008).  In a motion for summary disposition under MCR 2.116(C)(7), this Court considers "all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them." *Beals*, 497 Mich at 370 (quotation marks and citation omitted).  "If the facts are not in dispute and reasonable minds could not differ concerning the legal effect of those facts, whether the claim is barred by immunity is a question for the court to decide as a matter of law." *Id*. (quotation marks and citation omitted).

A motion under MCR 2.116(C)(8) "tests the legal sufficiency of a claim based on the factual allegations in the complaint." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019) (emphasis omitted).  The trial court must decide the motion on the pleadings alone, accepting as true all factual allegations contained therein, as well as any reasonable inferences or conclusions that can be drawn from the facts. *Peters v Dep't of Corrections*, 215 Mich App 485, 486; 546 NW2d 668 (1996).  A motion under MCR 2.116(C)(8) may be granted only when the claim is so clearly unenforceable that no factual development could possibly justify recovery. *El-Khalil*, 504 Mich at 160.  Further, "[a] mere statement of a pleader's conclusions and statements of law, unsupported by allegations of fact, will not suffice to state a cause of action." *Varela v Spanski*, 329 Mich App 58, 72; 941 NW2d 60 (2019).

To the extent resolution of this issue involves statutory interpretation, this Court reviews de novo whether a trial court properly interpreted and applied the relevant statutes. *Wiesner v Washtenaw Co Community Mental Health*, 340 Mich App 572, 580; 986 NW2d 629 (2022).

## III. ABSOLUTE IMMUNITY

Defendant first argues the trial court erred by concluding a question of fact remained whether he was entitled to absolute immunity under the GTLA. Concluding that defendant did not meet his burden to establish he had absolute immunity as a matter of law, we disagree.

Under the GTLA, the Michigan Legislature has determined that certain elective or appointive officials have absolute immunity from tort liability when acting within the scope of their authority: "A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." MCL 691.1407(5). The purpose of absolute immunity is to shield public employees who are responsible for broad, essential governmental decision-making so they may fulfill their public duties without being intimidated. *Grahovac v Munising Twp*, 263 Mich App 589, 595; 689 NW2d 498 (2004). To show entitlement to absolute immunity from tort liability, the governmental employee must establish "(1) that he or she is a judge, legislator, or the elective or highest appointive executive official of a level of government and (2) that he or she acted within the scope of his or her judicial, legislative, or executive authority." *Petipren v Jaskowski*, 494 Mich 190, 204; 833 NW2d 247 (2013). The governmental employee bears the burden of establishing entitlement to absolute immunity. *Id.*

In this case, defendant contends that he is entitled to absolute immunity because he is the highest appointive executive official of a level of government as the Director of the Water Department. To determine whether defendant is entitled to absolute immunity, this Court must first determine whether the Water Department constitutes a "level of government" and, if answered in the affirmative, then determine whether defendant is its "highest appointive executive official."

To decide whether an entity is a "level of government" within the meaning of MCL 691.1407(5), this Court has looked at several factors. These include "whether the entity shares aspects of governance with other political subdivisions, such as the power to levy taxes, the power to make decisions having a wide effect on members of the community, or the power of eminent domain." *Grahovac*, 263 Mich App at 593. This Court has also considered whether the government employee exercises "broad-based jurisdiction or extensive authority similar to that of a judge or legislator," *Id.*, quoting *Chivas v Koehler*, 182 Mich App 467, 471; 453 NW2d 264 (1990), and whether the entity has "autonomous authority." *Davis v Detroit*, 269 Mich App 376, 381; 711 NW2d 462 (2006)

In *Grahovac*, 263 Mich App at 594, this Court concluded that a volunteer fire department was not a level of government because no evidence supported that the fire department had any powers of governance. The defendant lacked the power to levy taxes, the power of eminent domain, the power to make decisions having a wide effect on members of the community, or any broadly-based jurisdiction or extensive authority. *Id.* The Court noted that all of these powers were specifically granted by the Legislature to the township board or other government agencies. *Id.* Instead, the volunteer fire department was "at the complete disposal of the township board and [could] neither exist nor act without the board's authorization." *Id.* This Court concluded the township board was the relevant level of government and, consequently, the fire department chief was not entitled to absolute immunity. *Id.*

In *Davis*, 269 Mich App at 381, this Court concluded that Detroit's fire department and water and sewage department were levels of government. The *Davis* Court distinguished *Grahovac* on the basis that *Grahovac* involved a township, which unlike cities, was governed solely by legislative provisions. *Id*. at 380. In contrast, the Court looked to the Detroit City Charter and Detroit City Code to determine whether the departments were levels of government. *Id*. at 381. It concluded that the charter and code granted the fire commissioner and board of water commissioners "autonomous authority that was not alleged in *Grahovac*." *Id*. citing 1997 Detroit Charter, §§ 7-801, 7-802, 7-804, 7-806, 7-1501, and 7-1502.

In this case, O'Malley does not contend that the Water Department holds traditional powers of governance such as the power to levy taxes or the power of eminent domain. Rather, O'Malley argues the Water Department was similar to the departments in *Davis* because it has autonomous authority over matters related to water in Benton Harbor. In the trial court and this Court, O'Malley relied on §§ 3.16, 3.17, and 3.38 of the Benton Harbor Charter to support this assertion. However, these provisions do not establish as a matter of law that the Water Department exercised autonomous authority over the water supply.

Section 3.16 provides that "[t]he administrative functions and powers of the City shall be divided into eight departments as follows: Law; Finance; Public Works and Service; Public Welfare; Public Health; Water; and Sewage Disposal, subject to modification hereinafter provided." Benton Harbor Charter, § 3.16. The next section describes the directors of each of the departments:

> There shall be a Director of every department who shall have the supervision and control thereof. The Commission shall appoint the Director of Law and the Director of Finance and they shall be responsible to the supervision and control of the Commission in the discharge of their duties; the Manager shall appoint and employ the Directors of the other departments and they shall be responsible to the supervision and control of the Manager for the discharge of their duties . . . . All such Directors shall be appointed or employed for an indefinite term and only at the will of the Commission or Manager respectively, as the case may be, and may be removed at any time at the pleasure of the Commission or Manager respectively, by whom such Director is appointed or employed. [Benton Harbor Charter, § 3.17.]

Finally, under § 3.38:

> The Director of the Water Department shall be a licensed operator with qualifications as designated by the Michigan State Board of Health and shall have direct supervision of the municipal supply and all works, lands, water, lands under water, dams, pumping stations, ways, water mains, pipes and all other works and property connected therewith." [Benton Harbor Charter, § 3.38.]

O'Malley contends that these provisions collectively demonstrate that the Water Department had autonomy over the City's water works system, including all administrative functions related to water, and it did not require the Water Department to collaborate with any other entity.

Viewed in isolation, these provisions do not establish as a matter of law that the Water Department had autonomous authority over water in Benton Harbor. Rather, the provisions only provide that the City Commission tasked the Director of the Water Department with the "supervision" of the municipal water supply. Supervision alone is not synonymous with autonomous authority. These three provisions are not comparable to the charter provisions in *Davis*. They do not establish that the Water Department was an autonomous governmental unit with the power to make independent decisions.

Moreover, as explained by the trial court, O'Malley only presented a few pages of the Benton Harbor Charter, leaving a question of fact whether the remainder of the Charter or other facts supported a determination that the Water Department exercised autonomous authority over the municipal water supply. As the party moving for summary disposition, O'Malley bore the burden of presenting evidence in support of his argument and he failed to do so. As such, he was not entitled to summary disposition.

Indeed, other provisions in the Benton Harbor Charter counsel against a determination that the Water Department exercises autonomous authority. Chapter XI of the Charter supports that the Commission, rather than the Water Department, holds decision-making power over the municipal water supply. The Commission holds the power to make ordinances, rules, and regulations for the maintenance of the municipal water supply. Benton Harbor Charter, § 11.11. The Commission holds the power to improve upon or expand the water system. Benton Harbor Charter, § 11.12. Finally, the Commission holds the power to levy taxes for water use. Benton Harbor Charter, § 11.13.

O'Malley argues the Benton Harbor Charter "makes clear" the Water Department's power includes the promulgation of rules and regulations. The Benton Harbor Charter does not support this assertion. Rather, the Charter grants the power to promulgate rules and regulations regarding the water supply to the Commission. Benton Harbor Charter, § 11.11. The section O'Malley relied on is actually found in the Benton Harbor Code of Ordinances and it does not support that the Water Department has any power to promulgate rules and regulations. It merely provides that individuals seeking to access city water agree to be bound by the rules and regulations relevant to the Water Department. Benton Harbor Code of Ordinances, § 44-16(c).

In conclusion, O'Malley conceded that the Water Department lacked traditional powers of governance. Moreover, no showing was made that the Water Department had "broad-based jurisdiction or extensive authority similar to that of a judge or legislator." *Grahovac*, 263 Mich App at 593 (quotation marks and citation omitted). Finally, defendant did not present evidence that the Water Department exercised autonomous authority; rather, the Charter and Code of Ordinances counsel against such a determination. Because defendant failed to establish that the Water Department is a "level of government" within the meaning of MCL 691.1407(5), he is not entitled as a matter of law to absolute immunity.

## IV. QUALIFIED IMMUNITY

Defendant contends that, even if this Court disagrees that he had absolute immunity, he had qualified immunity. In support of this argument, defendant argues the trial court erred by

determining plaintiffs sufficiently pleaded O'Malley's conduct was grossly negligent and the proximate cause of their injuries. We disagree with both contentions.

Under the GTLA, governmental employees are "generally immune from tort liability when they are engaged in the exercise or discharge of a governmental function." *Ray*, 501 Mich at 62. The GTLA provides several exceptions to this rule. Relevant to this appeal:

> [E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by . . . employee . . . while in the course of employment  . . . if all of the following are met:
>
> (a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. [MCL 691.1407(2).]

The governmental employee bears the burden of establishing his or her entitlement to immunity as an affirmative defense. *Ray*, 501 Mich at 62.

The parties do not dispute that subdivisions (a) and (b) were satisfied in this case. However, the parties dispute subdivision (c). Accordingly, this Court must assess whether plaintiffs sufficiently pleaded that O'Malley's conduct was "grossly negligent" and the "proximate cause" of plaintiffs' injuries. A plaintiff alleging gross negligence must also plead the elements of ordinary negligence, i.e., duty, breach, causation, and damages. See *Cummins v Robinson Twp*, 283 Mich App 677, 692; 770 NW2d 421 (2009).

Defendant first argues plaintiffs' allegations related to O'Malley were conclusory statements, unsupported by factual allegations, such that plaintiffs failed to set forth the elements of negligence. Although it is true that a complaint that contains mere conclusory statements unsupported by factual allegations will not survive a motion for summary disposition under MCR 2.116(C)(8), *Varela*, 329 Mich App at 72, plaintiffs' complaint contained sufficient factual allegations to survive the motion for summary disposition. Defendant's argument takes a myopic view of plaintiffs' complaint that is unsupported by the pleading requirements necessary to survive a motion for summary disposition under MCR 2.116(C)(8). As previously stated, when considering such a motion, this Court must accept as true all factual allegations contained therein, as well as any reasonable inferences or conclusions that can be drawn from the facts. *Peters*, 215 Mich App at 486.

In their complaint, plaintiffs allege O'Malley was grossly negligent because he (1) failed to act or took ineffective action to remedy the lead contamination after its discovery; and (2) "repeatedly denied, lied, and covered up this public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink." As noted by the trial court, some of the allegations in plaintiffs' complaint are conclusory; however, plaintiffs sufficiently pleaded factual allegations related to O'Malley to support their legal conclusions.

First, plaintiffs alleged O'Malley's "inaction or ineffective action failed to stop the exceedingly high lead action level exceedances." The complaint explains O'Malley was the Director of the Water Department during the period when Benton Harbor's water supply exceeded the lead action level. Plaintiffs allege he violated both federal and Michigan SDWA requirements and guidelines for selection, use, and monitoring of corrosion-control measures to eliminate the lead contamination. The complaint explained that governing authorities use "corrosion control treatment" to prevent lead leaching from older pipes into the water supply. When choosing from the various methods of corrosion control, the governing authority must choose a ratio and dosage tailored to the needs of the particular water system and monitor its effectiveness. Likewise, the governing authority was required to perform a corrosion-control study before implementing the treatment.

Despite these requirements, O'Malley submitted a permit application to EGLE, which included use of the generic "Carus 8600" phosphate blend to treat the lead contamination when that blend had not been tested for use in the Benton Harbor water system and defendants did not attempt to tailor the blend to the particular water system. Defendants never completed a corrosion-control study and failed to monitor for the blend's effectiveness after implementing it. This resulted in the level of lead in the water increasing.

Additionally, plaintiffs do not merely plead that O'Malley failed to act or acted ineffectively. Rather, they pleaded that O'Malley affirmatively acted to obscure the results of the corrosion control. Plaintiffs alleged he obscured the results of the Carus 8600 blend by refusing to disclose the addresses of the testing sites to EGLE and requested to reduce the number of testing sites. Related to the issue of E. coli contamination, plaintiffs pleaded O'Malley used "false technical excuses" to cover up discrepancies in water supply testing that the EPA determined were inaccurate. Finally, plaintiffs alleged defendant was terminated from his position for falsifying Water Department documents.

Collectively, these factual allegations could support that O'Malley did not act or, when he did act, he did so ineffectively because he improperly selected the corrosion-control treatment. Likewise, these factual allegations support that he intentionally obscured the results of the treatment plan to mislead state regulators regarding its success. Consequently, plaintiffs' complaint was not devoid of factual allegations in support of this theory of recovery.

Defendant contends that because defendant Elhorn Engineering ("Elhorn") recommended use of Carus 8600 and EGLE approved the permit application submitted by O'Malley, the injury plaintiffs alleged arose out of EGLE's and Elhorn's actions rather than O'Malley's actions. Indeed, plaintiffs alleged Elhorn recommended selection of Carus 8600 for corrosion control and EGLE ultimately approved the permit application requesting to use the product. However, even accepted as true, these pleadings do not negate O'Malley's role, as Director of the Water Department, in selecting and using Carus 8600 in the water system. The fact that he consulted with other entities and sought approval does not alter his responsibility for the alleged harm plaintiffs suffered. Likewise, this argument ignores plaintiffs' pleading that O'Malley attempted to obscure the testing results. Drawing reasonable inferences from these pleadings, plaintiffs have sufficiently alleged a connection between O'Malley's actions and the harm to plaintiffs.

Defendant also argues that plaintiffs failed to show defendant breached a duty to them because plaintiffs insufficiently pleaded that he did not meet an obligation by testing fewer than the required number of homes or that he was required to disclose the addresses of the testing sites to EGLE. He also argues his attempt to lower the number of testing sites was denied by EGLE. Again, this argument takes too narrow a view of the complaint. First, plaintiffs alleged that "O'Malley refused to disclose the addresses of the testing sites to EGLE." Reasonably inferred from use of the term "refused," EGLE requested that O'Malley disclose the testing sites and he refused that request. Second, although defendant correctly points out that EGLE denied his request to reduce testing sites and, therefore, he did not cause any direct harm to plaintiffs by reducing the testing sites, these allegations provide context and support to plaintiffs' larger allegation that O'Malley attempted to obscure testing results and mislead the public regarding efforts to reduce the lead level in the water supply.

Defendant correctly notes that, although plaintiffs allege O'Malley was fired from his position for falsifying documents, they do not allege that the documents were related to lead contamination or explain what misconduct was at issue. However, it is possible, drawing reasonable inferences from the complaint and viewing this allegation in the context of all allegations, that O'Malley was fired for falsifying documents related to his handling of the lead and bacteria contamination. Ultimately, even if this particular allegation is conclusory, plaintiffs have sufficiently pleaded other factual allegations to survive defendant's motion for summary disposition.

In addition to the attempts to obscure the testing results, plaintiffs alleged that O'Malley lied to the public regarding the safety of drinking the water and the effectiveness of the mitigation measures. Plaintiffs point to two statements made by O'Malley in support of this allegation that they allege were false and misleading. First, O'Malley was alleged to have told a Benton Harbor resident that even if water in homes tested above 15 ppb, after the "first flush it was okay to drink and cook" with the tap water because "they provide clean water right to their spout." Second, O'Malley was alleged to have publicly and falsely stated inroads were being made to eliminate lead from the water when the corrosion-control treatment was not successfully treating the contamination. Likewise, plaintiffs alleged that all defendants told residents to use water filters in their homes when they knew the waters filters were not effective for lead concentrations over 150 ppb and, as early as 2019, some Benton Harbor homes had lead levels in excess of 150 ppb.

The next question is whether plaintiffs pleaded a valid claim for gross negligence with these allegations. The GTLA defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). This Court has noted that this definition suggests "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). Further, "[i]t is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id*. However, "[s]imply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Id*.

Plaintiffs allege that O'Malley selected Carus 8600 to treat the water without defendants testing it or tailoring it to the particular water system. They additionally allege this caused the lead

level to increase. They also assert defendant lied about, denied, and attempted to cover up the water contamination by misleading state regulators regarding testing procedures and lying to Benton Harbor residents about the success of the Water Department's efforts to treat the water and the propriety of drinking the water.

These allegations do not contend that O'Malley created this public health crisis. They contend that he exacerbated the water crisis by mishandling its remediation, engaging in obstructive conduct, and lying to the public about the success of their efforts and the propriety of drinking the water when he knew lead contamination was an ongoing and worsening issue.

Lead is a well-known toxin. O'Malley was the Director of the Water Department and was specifically trained and licensed to supervise the municipal water supply. Benton Harbor Charter, § 3.38. Someone in his position would be well-aware of the dangers of exposing the public to lead contamination. Plaintiffs allege his conduct exposed Benton Harbor residents to that toxin and encouraged them to continue drinking from the water supply under the false belief that the City was effectively remediating the issue and that measures, such as water filters, would make the water safe to consume. A reasonable juror could conclude that O'Malley's conduct was "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Accordingly, the trial court did not err by concluding plaintiffs sufficiently pleaded a claim of gross negligence.

For purposes of the GTLA, even if a government employee's conduct was grossly negligent, he or she is immune from liability unless that conduct was "the proximate cause" of the plaintiffs' injuries. MCL 691.1407(2)(c). Proximate cause, or legal cause, is distinct from factual cause, or cause in fact, which "requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Ray*, 501 Mich at 63 (quotation marks and citation omitted). Whether a defendant's conduct was the proximate cause "requires a determination of whether it was foreseeable that the defendant's conduct could result in harm to the victim." *Id*. at 65. Stated otherwise, "the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Id*. at 64 (quotation marks and citation omitted). Generally, there may be more than one proximate cause of an injury, but for purposes of the GTLA, a government employee's conduct cannot be the proximate cause unless it was "the one most immediate, efficient, and direct cause of the injury . . . ." *Id*. at 65 (quotation marks and citation omitted).

Defendant contends that as a matter of law he cannot be the proximate cause of plaintiffs' injury because, as pleaded, the lead leaching into the water system from the aging pipes was the most immediate, efficient, and direct cause of injury. However, our Supreme Court has warned against this type of analysis because it weighs factual causes instead of assessing the legal responsibility of the actors involved. *Id*. at 71-72. In *Ray*, the Supreme Court overturned its previous order in which it held that under the GTLA a claim against a firefighter, who was allegedly grossly negligent in fighting a house fire that killed the plaintiff's child, was not the proximate cause because the fire was the proximate cause. *Id*., overruling *Dean v Childs*, 474 Mich 914; 705 NW2d 344 (2004). The Supreme Court explained this analysis was erroneous:

> Determining proximate cause under the GTLA, or elsewhere, does not entail the weighing of factual causes but instead assesses the legal responsibility of the actors involved. Moreover, because proximate cause is concerned with the foreseeability

of consequences, only a human actor's breach of a duty can be a proximate cause. Consequently, nonhuman and natural forces, such as a fire, cannot be considered "the proximate cause" of a plaintiff's injuries for the purposes of the GTLA. Instead, these forces bear on the question of foreseeability, in that they may constitute superseding causes that relieve the actor of liability if the intervening force was not reasonably foreseeable. [*Ray*, 501 Mich at 71-72.]

Applied to this case, the fact that the presence of lead in Benton Harbor's 100-year-old water system is among the factual causes of plaintiffs' injuries does not negate the possibility of O'Malley being the proximate cause.

Moreover, the allegations in this case are not that defendants caused the lead to be present in the water system. The allegations are that, after discovering the lead contamination, O'Malley exacerbated the water contamination by improperly treating for corrosion and making false and misleading statements to the public that assured that their drinking water was safe, all while knowing that dangerous levels of lead were present in the drinking water. Accepting these pleadings as true, it is foreseeable that the harm pleaded by plaintiffs was the general kind of harm that O'Malley's conduct negligently risked. *Id*. at 64. Likewise, a reasonable juror could conclude that he was the most immediate, efficient, and direct cause of plaintiffs' injuries. Accordingly, a question of fact remains whether O'Malley was the proximate cause of plaintiffs' injuries.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ James Robert Redford